IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-cr-00555-DKW<br>Case No. 23-cv-00297-DKW-KJM |
| Plaintiff, | **ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY; (2) DENYING MOTION FOR COLLATERAL RELIEF AND REQUEST FOR EVIDENTIARY HEARING PURSUANT TO 28 U.S.C. § 2255; AND (3) DENYING CERTIFICATE OF APPEALABILITY** |
| vs. | |
| JUSTIN KA'ANOI aka "Justin K. Wilcox," | |
| Defendant. | |

Petitioner Justin Ka'anoi (aka Justin K. Wilcox)[1] moves pursuant to 28

U.S.C. § 2255 to vacate his sentence for distribution of methamphetamine and

cocaine, as well as for money laundering.  Ka'anoi contends that both his attorneys

throughout the criminal process provided constitutionally ineffective assistance of

counsel.  He fails, however, to show that either of his attorneys engaged in

constitutionally deficient conduct, or that any prejudice resulted from his

---

[1]Petitioner was initially indicted under the name "Justin K. Wilcox."  *See* Dkt. No. 7. Throughout his proceedings, however, petitioner repeatedly informed the Court that his true or legal name is "Justin Ka'anoi."  *See, e.g.*, Dkt. No. 599 (granting motion for a request of name change within the U.S. Department of Justice and Federal Bureau of Prisons); Dkt. No. 623 (amending the final judgment to reflect the same).  Accordingly, the Court will refer to petitioner as "Ka'anoi" herein.

allegations of the same.  Accordingly, as more fully discussed below, the motions

pursuant to Section 2255, Dkt. Nos. 645 & 647, are DENIED.  Additionally, as

reasonable jurists would not debate the denial of these motions, a certificate of

appealability is also DENIED.

**FACTUAL & PROCEDURAL BACKGROUND**

**I.**     **Charges**

On September 27, 2017, a grand jury returned an indictment against nine

defendants, including lead defendant Ka'anoi.  Dkt. No. 7.  Ka'anoi was charged

with: (1) one count of conspiracy to distribute and to possess with the intent to

distribute 50 grams or more of methamphetamine and 500 grams or more of

cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)–(B) (Count

1); (2) two counts of possession with the intent to distribute 50 grams or more of

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Counts

12–13); and (3) one count of conspiracy to commit money laundering in violation

of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), and 1956(a)(1)(B)(i) (Count 14).  *Id.*

Further, on September 29, 2017, the Government filed a Special Information as to

Prior Drug Conviction of Defendant ("Section 851 Information"), notifying

Ka'anoi that due to his three prior state felony drug convictions, he was subject to

- 2 -

enhanced punishment, including a mandatory minimum life sentence, pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  Dkt. No. 28.

## II.   <u>Plea Negotiations</u>

On September 29, 2017, Kaʻanoi was arraigned on the charges in the indictment and entered a plea of not guilty.  Dkt. No. 35.  On November 2, 2017, Kaʻanoi retained Thomas Otake as his attorney.  Dkt. No. 106.  Otake subsequently engaged in negotiations with the Government, culminating in Kaʻanoi entering into a proffer agreement on December 6, 2018.  Dkt. No. 515-2.  By the terms of this agreement, Kaʻanoi agreed to disclose all criminal wrongdoing committed by himself and others, with the exception of Wayne Lopaka Kahale—Kaʻanoi's childhood friend.  *Id.*  Thereafter, Kaʻanoi participated in three proffer sessions between December 2018 and November 2019.  Dkt. No. 533-1 at 10; Dkt. No. 533-12; Dkt. No. 533-13.

In December 2018—during the pendency of Kaʻanoi's participation in these proffer sessions—Congress enacted the First Step Act.  Dkt. No. 656 at 2; *see also* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018).  Among other things, under the First Step Act, Kaʻanoi's prior drug felony convictions no longer qualified as the "serious drug felonies" that would have subjected him to a mandatory minimum life sentence.  Dkt. No. 340.  Accordingly, on August 2,

2019, the Government withdrew the Special Information, relieving Kaʻanoi from the prospect of such a sentence. *Id.*

Shortly thereafter, on August 5, 2019, Kaʻanoi pled guilty to Counts 1 and 14 of the Indictment pursuant to a plea agreement. Dkt. No. 343; Dkt. No. 344. At the change of plea hearing, the Court engaged in a detailed colloquy with Kaʻanoi over the nature and substance of his plea and Otake's representation. *See* Dkt. No. 343; Dkt. No. 527. Thereafter, the Court accepted Kaʻanoi's plea. Dkt. No. 527 at 38.

## III.   Sentencing

On October 4, 2019, the U.S. Probation Office issued an initial draft Presentence Investigation Report ("PSR"), Dkt. No. 401, followed by a revised PSR on December 30, 2019, Dkt. No. 419. The PSR held Kaʻanoi responsible for a total converted drug weight of 168,518.60 kilograms,[2] resulting in a base offense level of 38. Dkt. No. 419 at 17. The PSR added four levels under USSG § 3B1.1 for Kaʻanoi's role as an organizer or leader of the criminal activity and subtracted three levels for acceptance of responsibility under USSG § 3E1.1. *Id.* at 17–18. Accordingly, Kaʻanoi's total offense level was calculated at 39, which, when

---

[2] As Kaʻanoi's offenses involved two different types of drugs—"ice" and cocaine—the United States Sentencing Guidelines ("USSG") required converting both to a standardized converted drug weight. *See* Dkt. No. 419 at 17; U.S. Sent'g Guidelines Manual § 2D.1 cmt. 8.

coupled with his criminal history category of IV, resulted in a guideline sentencing range of 360 months to life.  *Id.* at 39.

Subsequently, on January 13, 2020, the Court permitted Otake to withdraw as counsel and substituted Mark Kawata.  Dkt. No. 425.  On February 1, 2021, the Government filed a motion for a downward departure based on Kaʻanoi's assistance pursuant to USSG § 5K1.1.  Dkt. No. 515.  In that motion, the Government requested a one-level downward departure and recommended a 336-month term of imprisonment.  Dkt. No. 515-1 at 5–6.  On February 16, 2021, Kaʻanoi filed objections to the PSR, principally disputing the timeline of his involvement in the drug-selling conspiracy and the drug weights attributed to him. Dkt. No. 519.  U.S. Probation issued the final PSR on March 9, 2021, again finding Kaʻanoi's total offense level to be 39, his criminal history category to be IV, and the applicable guideline range to be between 360 months to life.  Dkt. No. 526 at 42.  The PSR, nonetheless, recommended sentences of 324 months on Count 1 and 240 months on Count 14, terms to run concurrently.  *Id.*

On March 23, 2021, Kaʻanoi filed a motion to withdraw his guilty plea. Dkt. No. 533.  Therein, Kaʻanoi contended that Otake, his former counsel, had: (1) failed to properly communicate with him; (2) "unfairly convinced" Kaʻanoi to enter into the proffer agreement and to plead guilty; (3) misrepresented the drug quantities for which he would be held accountable; (4) "grossly mischaracterized"

the factual stipulations in the plea; and (5) "grossly mischaracterized" the potential sentence he could face in the event that he pleaded guilty. Dkt. No. 533-1 at 25–31. Having considered these arguments—many of which are raised again in the present motions—the Court denied the motion to withdraw the guilty plea, finding Ka'anoi's assertions to contradict the record and lack credibility. Dkt. No. 566; *see also* Dkt. Nos 645–647.

On June 16, 2021—one day before his scheduled sentencing hearing—Ka'anoi filed a motion to continue sentencing. Dkt. No. 575. He asserted that sentencing should be continued because of a new *Brady-Giglio* disclosure that called into question whether he should be held responsible for 4,532 grams of methamphetamine that were found in co-defendant Shane Kaui's car. *Id.* At sentencing the next day, Ka'anoi withdrew his continuance request upon the Government's stipulation that it would not hold him responsible for those drugs, thereby decreasing his total offense level by two. Dkt. No. 601 at 2–4. During the hearing, the Court additionally overruled Ka'anoi's objection to a four-level enhancement for his role as the leader or organizer of the conspiracy. Dkt. No. 601 at 10–15. Specifically, the Court found that:

> The defendant dictated the quantities and prices that his customers . . . would receive, what they would be paid for their efforts, and whether product would be extended and to whom on a consignment basis. . . . He also laundered the drug trafficking proceeds and invested those proceeds back into the business paying for things like storage costs for drugs and money,

and transportation and hotel costs necessitated by the fact that his supply line extended all the way to Las Vegas."

*Id.* at 14–15.  Accordingly, "[Kaʻanoi] was quite clearly the local source of supply of both methamphetamine and cocaine during the referenced conspiracy period . . . and there's no evidence . . . that anyone else was his equal." *Id.* at 13.  Finally, the Court granted the Government's motion for a one-level downward departure for substantial assistance. *Id.* at 40.  In light of these considerations and the sentencing factors laid out in 18 U.S.C. § 3553(a), the Court sentenced Kaʻanoi to a mid-guideline range term of imprisonment of 295 months on Count 1 and 240 months on Count 14, terms to run concurrently. *Id.* at 41–48.

## IV.   <u>Appeal</u>

On June 29, 2021, Kaʻanoi appealed his sentence.  Dkt. No. 580.  In response, the Government moved to dismiss the appeal, contending that Kaʻanoi's plea agreement contained a waiver of his right to appeal.  *See* Dkt. No. 656 at 9.  Finding this waiver applicable and enforceable, the Ninth Circuit dismissed the appeal.  Dkt. No. 607.  In doing so, the Ninth Circuit noted that "[t]o the extent appellant contends the waiver is unenforceable because he received ineffective

assistance of counsel, we decline to address his claims of ineffective counsel on direct appeal."  *Id.* at 2.

## V.   Section 2255 Motion

On February 7, 2023, Kaʻanoi filed a motion for withdrawal of counsel and appointment of substitute counsel.  *See* Dkt. No. 634; Dkt. No. 635.  The Court permitted Kawata to withdraw as counsel, but declined to appoint Kaʻanoi substitute counsel.  Dkt. No. 639.  Accordingly, on July 17, 2023, Kaʻanoi, acting *pro se*, filed the instant Section 2255 motions.  Dkt. Nos. 645-647.  Therein, Kaʻanoi contends, through myriad sub-arguments, that both Otake and Kawata rendered ineffective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).

On October 31, 2023, the Government filed its Opposition.  Dkt. No. 656. Kaʻanoi filed his Reply on December 5, 2023.  Dkt. No. 659.  With briefing complete, this Order now follows.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a court established by Act of Congress . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence."  28 U.S.C. § 2255(a).  To grant such relief, the sentencing court must conclude "that the sentence was imposed in violation of the Constitution or the laws of the United States, or that the

court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" *Id.*

## DISCUSSION[3]

Ka'anoi's claims of ineffective assistance of counsel fall into two categories: those directed against Otake during the plea stage, and those directed against Kawata during sentencing.  Within each category, Ka'anoi raises several sub-claims.  Specifically, against Otake, Ka'anoi contends: (1) Otake failed to advise him as to the passage of the First Step Act and its impact on his possible sentence; (2) Otake failed to properly communicate with him; (3) Otake failed to share discovery with him; (4) Otake misrepresented certain factual stipulations that were contained in the plea agreement; (5) Otake mischaracterized his likely sentence; and (6) Otake was biased due to conflicting representations.  *See generally* Dkt. No. 646; Dkt. No. 647.  Against Kawata, Ka'anoi asserts: (7) Kawata failed to properly communicate with him; (8) Kawata failed to raise key issues in the motion to withdraw his guilty plea; (9) Kawata improperly accepted the Government's offer to stipulate to the quantity of drugs for which Ka'anoi would be held responsible; (10) Kawata did not argue with sufficient force against the

---

[3]As Ka'anoi is *pro se*, the Court liberally construes his filings.  *See Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987).

application of the four-level leader/organizer enhancement at sentencing; and (11) Kawata failed to timely file a petition for a writ of certiorari to the Supreme Court. *Id.* The Court addresses each ground for relief in turn.[4]

## I.    **Legal Framework**

As an initial matter, the Court begins with the legal framework for ineffective assistance of counsel claims.  The Sixth Amendment guarantees criminal defendants a right to the effective assistance of counsel.  *Strickland*, 466 U.S. at 684–86.  To prevail on a claim of ineffective assistance of counsel, a defendant must establish: (1) that "counsel's representation fell below an objective standard of reasonableness"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.  In other words, the petitioner must show both that counsel's performance was deficient *and* that the deficiency was prejudicial.  *Id.* at 692.  The Court has discretion over the sequence in which to conduct this inquiry

---

[4]Kaʻanoi protests that his claims should not be parsed into separate grounds for relief, but rather considered under the totality of the circumstances.  Dkt. No. 659 at 2.  However, given that Kaʻanoi's filings total well over 200 pages, the Court has chosen to organize the two overarching ineffective assistance of counsel claims by separately addressing each argument for relief.  Such organizational choices do not detract from the Court's consideration of each claim under the totality of the circumstances.

and may decline to "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

When evaluating deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Accordingly, although the Court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance…the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Therefore, "conclusory allegations unsupported by specifics [are] subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

## II.    Claim #1: Thomas Otake

Kaʻanoi first contends that his attorney, Thomas Otake, was constitutionally ineffective throughout the plea agreement process. Many of these arguments have previously been raised—and denied—in Kaʻanoi's motion to withdraw his guilty plea. *See* Dkt. No. 533; Dkt. No. 566. Nevertheless, the Court addresses them again in the context of the instant motions.

When considering prejudice in the context of a guilty plea, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he

would not have pled guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In undertaking this evaluation and "determining whether a plea was voluntarily and knowingly made, a defendant's plea colloquy is given great weight." *Aruda v. United States*, 2017 WL 1737719, at *4 (D. Haw. May 3, 2017) (quotation marks, brackets, and citations omitted).

> ## A.   Ground 1: Change in the Law
>
> ### i.   Proffer Agreement

Ka'anoi first argues that Otake was ineffective by failing to inform him during the negotiation of the proffer agreement in November 2018 that the then-pending First Step Act could affect his exposure to a mandatory minimum life sentence. Dkt. No. 646 at 27. Rather, Otake encouraged him to "enter into this portion of the plea process, i.e., cooperation under the yoke of the 851's statutory mandatory life sentences" despite the First Step Act being enacted less than two months later. *Id.* at 26. Ka'anoi argues that had he "known that this FSA was imminent, he would have been in a better position during this 'plea negotiation process' including the cooperation element of such" and may have insisted on going to trial. *Id.* at 27–28; *see also id.* at 24 ("[The mandatory life sentence] was a real and substantial threat upon this Petitioner's life when he made this decision to cooperate with the government.").

This argument is unavailing. As Ka'anoi acknowledges, at the time he decided to cooperate with the Government, the First Step Act had not yet been signed into law. *See id.* at 26 ("on December 21, 2018 (less than two months *later*) the then President Donald J. Trump signed into law the Congressionally enacted First Step Act" (emphasis added)). The Ninth Circuit has explained that "[g]iven that the reasonableness of counsel's conduct must be evaluated based on the time it occurred, courts have articulated a rule that ineffective assistance of counsel claims generally cannot be predicated on counsel's *failure to anticipate* changes in the law." *United States v. Juliano*, 12 F.4th 937, 940 (9th Cir. 2021) (emphasis added). Accordingly, in advising Ka'anoi with regard to cooperation in November 2018, Otake could not be expected to anticipate the enactment of the First Step Act, let alone the substantive provisions of the same. *See id.* at 941 (explaining that counsel's failure to anticipate the First Step Act was not objectively unreasonable in October 2018 when there was still significant uncertainty regarding the potential enactment of the First Step Act). The Court finds, therefore, that Otake did not render ineffective assistance in this regard.

### ii. <u>Plea Agreement</u>

Ka'anoi also contends that Otake was ineffective by failing to advise him as to the First Step Act prior to entering into his plea agreement. Dkt. No. 646 at 19, 27–29. Specifically, Ka'anoi explains that he "was not informed of this change of

law as he sat in pretrial custody." *Id.* at 27.  Rather, Otake merely presented him

with the plea agreement in August 2019—eight months *after* the enactment of the

First Step Act—without any further counseling.  *Id.*  In doing so, "Otake lead [sic]

Petitioner to believe that, he was still under the yoke of the life sentence, and that

this Plea agreement would avail him of such." *Id.* at 19.  Ka'anoi asserts that

Otake's failure to inform him deprived him of his right to make an informed and

willing plea decision, and that he otherwise would not have accepted the terms of

the plea agreement.  *Id.* at 27–28, 57.

Such assertions, however, are simply not credible.  Otake categorically

denies Ka'anoi's claims, stating: "I vividly recall discussing with [Ka'anoi] that

the law had changed, and that he was no longer facing a mandatory life sentence

prior to him pleading guilty." Dkt. No. 656-1 at 8.  He further adds:

> Throughout the case, [Ka'anoi] was very active in his defense.  He studied
> the law, studied discovery, and made it a point to educate himself about the
> Federal criminal justice system; more so than many of my clients throughout
> my career.  He was well aware of the First Step Act prior to pleading guilty,
> both from my discussions with him, and from his own research into the law.
> . . .  Obviously, it was a huge development in the Federal criminal justice
> system, and to claim that I would not have known about it, or that [Ka'anoi]
> did not know about it, is ridiculous.

*Id.* at 9.  Moreover, beyond Otake's representations, Ka'anoi's claims are also

inconsistent with the record.  Not only did his plea agreement explain that the

Government agreed to withdraw the Section 851 Special Information, which had

formerly provided a basis for the mandatory minimum life sentence,[5] it explicitly

stated that the potential penalties he now faced included:

> <u>Count 1:</u> Imprisonment for not more than life . . . a mandatory minimum term of imprisonment of *ten (10) years*.

> <u>Count 14:</u> Imprisonment for *not more than twenty (20) years*.

Dkt. No. 344 at 5 (emphasis added); *see also* Dkt. No. 656-1 at 6 (Otake's

declaration that he "thoroughly reviewed the final version of the entire plea

agreement with [Ka'anoi] prior to the change of plea hearing.").  Accordingly,

Ka'anoi cannot credibly argue that Otake failed to explain the First Step Act or that

he somehow understood that he was still subject to a mandatory minimum life

sentence at the time he entered his plea.

Even if the Court was willing to assume that *Otake* failed to advise Ka'anoi

of his potential sentence as a consequence of the First Step Act, the *Court* certainly

made no such error.  During Ka'anoi's sentencing hearing, the Court explicitly

inquired whether Ka'anoi understood the potential penalties he now faced.

Specifically, the Court asked:

> THE COURT:     Now, the government previously filed what [has been] referred to as a Section 851 Special Information; they did so in September of 2016 [sic 2017].  As of a week or so ago, August 2nd of this year, the government has dismissed that special

---

[5]The plea agreement states: "Prior to Defendant entering his guilty plea in this matter, the United States agrees to move to dismiss the Special Information, filed September 29, 2017, which alleged Defendant's prior State of Hawaii felony drug convictions."  Dkt. No. 344 at 3.

> information by order of this Court that dismissal is entered on the court's docket as document number 340.
>
> In light of the dismissal of the Section 851 Special Information, Mr. Inciong, what are the potential penalties that [Ka'anoi] faces for pleading guilty to each of Counts 1 and 14?

MR. INCIONG:    Thank you, Your Honor.  For Count 1, the conspiracy to distribute and possess with intent to distribute methamphetamine and cocaine charge, the penalties are as follows: There is a maximum penalty of life imprisonment; there is a *mandatory minimum of ten years imprisonment* that applies as well . . .  For Count 14, the conspiracy to commit money laundering.  The *maximum term of imprisonment is 20 years.*

. . .

THE COURT:    And, [Ka'anoi], do you, sir, understand the potential penalties that you face for pleading guilty to each of these two counts, Counts 1 and 14, *including* the mandatory term of imprisonment that applies to a violation of Count 1?

KA'ANOI:    Yes.

Dkt. No. 527 at 6–8 (emphases added).  These statements, made in court and under oath, carry with them "a strong presumption of veracity in subsequent proceedings attacking the plea."  *United States v. Ross*, 511 F.3d 1233, 1236–37 (9th Cir. 2008) (citations omitted).  As Ka'anoi was clearly aware that he no longer faced a mandatory minimum life sentence at the time he entered his plea, he has therefore failed to establish any prejudice from

- 16 -

Otake's alleged deficiency.  This claim of ineffective assistance of counsel is accordingly denied.

### B.   **Ground 2: Communication**

Beyond the First Step Act, Kaʻanoi also generally claims that Otake "abandoned him and refused to communicate with him" throughout the course of the representation.  Dkt. No. 647 at 21.  According to Kaʻanoi, Otake would communicate with him only when presenting cooperation or plea offers from the Government or when he was engaging in proffer sessions.  *See id.* at 21–31.  As such, Otake apparently failed to "explain[] any of the laws and intricacies regarding the procession to trial, or pleading guilty coupled with any cooperation" and failed to provide him with the written plea agreement until five minutes prior to the change of plea hearing.  *Id.* at 21; Dkt. No. 647-1 at 13.  Kaʻanoi therefore claims that Otake's failure to communicate deprived him of "adequate counseling on the ramifications on his preparation for trial, and the laws pertinent to prior convictions that had placed a yoke upon his neck of a statutory mandatory life sentence."  Dkt. No. 647 at 22.

As the Court previously held, however, in its Order denying Kaʻanoi's motion to withdraw his guilty plea, these assertions are simply not credible.  *See*

Dkt. No. 566 at 19–22.  For instance, Otake flatly contradicts Kaʻanoi's

characterization of their relationship, stating:

> I met with [Kaʻanoi] extensively to review the evidence and discuss his
> decision to cooperate and to plead guilty.  Although I did not keep track of
> the specific times I met with [Kaʻanoi], over the course of my lengthy
> representation of him, I would conservatively estimate that I met with him at
> FDC more than a dozen times prior to his change of plea.  . . . I did not
> always meet with [Kaʻanoi] with the frequency he desired, but I surely met
> with him more than enough to ensure that he was fully advised of his
> options, the evidence against him, his chances at trial, and the pros and cons
> of cooperation and a plea agreement.

Dkt. No. 656-1 at 3.  Otake's statements are further consistent with Kaʻanoi's own

representations—under oath—during the plea hearing.  At that time, the Court

specifically asked:

| | |
|---|---|
| THE COURT: | What is your understanding of the purpose of this morning's hearing? |
| KAʻANOI: | The purpose of this morning's hearing is for me to plead out to the charges at hand, take responsibility for my actions. |
| THE COURT: | Have you had enough time to discuss that decision, whether or not to plead guilty, as well as this case generally with Mr. Otake? |
| KAʻANOI: | Yes. |
| THE COURT: | Are you satisfied with his representation of you thus far in this case? |
| KAʻANOI: | Yes. |

Dkt. No. 527 at 4–5.  Given the presumption of veracity given to such statements, Kaʻanoi has failed to provide the Court with any credible evidence to believe that Otake rendered ineffective assistance in this regard.  This claim is therefore denied.

## C.  Ground 3: Discovery

Kaʻanoi next argues that Otake failed to provide him with requested discovery—namely audio recordings of wiretaps—prior to his decision to cooperate and to enter into a plea agreement.  Dkt. No. 646 at 35–38; Dkt. No. 647 at 22; Dkt. No. 647-1 at 6, 8.  Kaʻanoi explains that had he been able to review the recordings, he could have explained that he was not responsible for "ten pounds"[6] of the methamphetamine which the Government attributed to him.  Dkt. No. 646 at 37.  Therefore, by failing to provide these recordings, Otake "coerced [Kaʻanoi] into pleading guilty without access to the information he needed to make an intelligent choice."  *Id.*  Kaʻanoi asserts that had he been in possession of these recordings, he "would have insisted on proceeding to trial."  *Id.*

As an initial matter, Kaʻanoi appears to have had access to the very recordings of which he now claims to have been deprived.  For instance, although Otake acknowledges that he "do[es] not recollect whether the specific CD's with audio/video evidence was mailed to [Kaʻanoi] in this case, [he] do[es] recall

---

[6]This "ten pounds" refers to the 4,532 grams of methamphetamine seized from co-Defendant Kaui's vehicle.  *See* Dkt. No. 601 at 2–4.

listening to the audio/video evidence with [Kaʻanoi] repeatedly during [his] visits with him at FDC." Dkt. No. 656-1 at 3. Kaʻanoi "listened to [the CDs] with [Otake] present multiple times," such that he "was well aware of what the evidence against him was prior to entering his plea." *Id.* at 3–4. Indeed, Kaʻanoi has acknowledged the same. *See* Dkt. No. 565-3 at 3 (declaring that "Mr. Otake brought the CDs with him on one occasion to FDC, and he and [Kaʻanoi] listened to some of them for a few minutes."). Accordingly, having listened to the recordings with Otake, it is unclear how Kaʻanoi lacked the "information he needed to make an intelligent choice" about whether to enter into a plea agreement with the Government. Dkt. No. 646 at 37. Simply lacking physical copies of the discs, assuming that is what he contends, does not, by itself, indicate a lack of access.

Moreover, Kaʻanoi provides little explanation of what information is contained within the CDs that would have affected his decision to enter into a plea agreement. Rather, he merely states that the recordings "misrepresent" the disputed ten pounds of methamphetamine and that he could have explained this to the Government. *Id.* It is entirely unclear, however, how any misrepresentation on the tapes is related to the actual decision to plead guilty. *See id.* at 58 (explaining only that the recordings "goes in unison to his positions that the facts in the plea agreement were wrong and that, he would not have plead [sic] to such with

adequate representation").  Such conclusory allegations are not sufficient to establish prejudice.  Accordingly, Kaʻanoi's claim of ineffective assistance of counsel is denied in this regard.

### D.   Ground 4: Factual Stipulations in the Plea Agreement

In Ground 4, Kaʻanoi argues that Otake was ineffective by misleading him as to certain factual stipulations in the plea agreement—namely, the timing of his involvement in the conspiracy, the quantity of methamphetamine, the amount of U.S. currency, and the statement that others were working for Kaʻanoi.  Dkt. No. 646 at 20, 30–31; Dkt. No. 647 at 26; Dkt. No. 647-1 at 9.  Specifically, Kaʻanoi argues that he informed Otake that he "vehemently object[ed]" to the inclusion in the plea agreement of "a certain quantity of 'ten pounds' . . . for [he] did not have anything to do with any drugs in 2016."  Dkt. No. 647-1 at 9.  He further disputed that he was responsible for "the money discovered upon [co-defendant] Kawaika [sic] Puha's arrest at 'his residence' on June 16, 2016" and that he "enlisted the assistance of others" or instructed them to act on his behalf.  Dkt. No. 646 at 30–31; *see also* Dkt. No. 647-1 at 12.  Otake then "assured Petitioner that he would have the AUSA Inciong remove such."  Dkt. No. 646 at 20.  According to Kaʻanoi, he only discovered at the change of plea hearing that Otake had failed to do so.  Moreover, he would not have pled guilty had he known beforehand.  *Id.* at 20, 31– 32, 58; Dkt. No. 647 at 27.

However, as the Court previously explained at length, "[t]here simply was no ineffective assistance of counsel insofar as [Kaʻanoi's] methamphetamine responsibility is concerned."  Dkt. No. 566 at 16.  Nor was Otake ineffective with respect to any of the other factual stipulations that Kaʻanoi now disputes.  Otake asserts that:

> I discussed the plea agreement with [Kaʻanoi] on multiple visits prior to his change of plea hearing.  Based on our discussion, I tried to get revisions made to the proposed plea agreement.  The Government agreed to some of the revisions [Kaʻanoi] requested and others they did not.  Prior to the change of plea hearing, I clearly communicated to [Kaʻanoi] which changes the Government had and had not agreed to make to the plea agreement.  I also reminded him that any stipulations as to drug amounts agreed to by the parties were not binding upon the Court.  Based on our discussions, I believe that [Kaʻanoi] understood the entire agreement and was ready to change his plea.

Dkt. No. 656-1 at 6.  These statements align with Kaʻanoi's representations during the plea colloquy in which he affirmatively responded to the Court's explicit questions regarding whether he had read the plea agreement, understood each of its terms, and discussed it with Otake.  Dkt. No. 527 at 8–9.  Moreover, Kaʻanoi also confirmed that he understood that any stipulations in the plea agreement existed only between him and the U.S. Attorney's office and did not bind the Court.  *Id.* at 10.  Finally, the Court confirmed that Kaʻanoi agreed as to the conduct rendering him guilty, including the existence of the conspiracy, its duration, and the amount of controlled substances and currency involved.  *Id.* at 35–37.

As such, if Kaʻanoi's objection to any of the factual stipulations in the plea agreement would have resulted in him choosing not to plead guilty, he had several opportunities to raise that matter during the plea colloquy.  Instead, he affirmed—over and over—that he both understood the factual stipulations in the plea agreement and agreed to them.[7]  Given the strong presumption of veracity given to statements made under oath during plea proceedings, Kaʻanoi has therefore failed to provide the Court with any reason to believe that Otake engaged in deficient representation with regards to the factual stipulations in the plea agreement, or that any prejudice resulted from the same.  Accordingly, the Court does not find that Otake rendered unconstitutionally ineffective assistance in this regard.

---

[7]Kaʻanoi appears to contend that he failed to raise his factual concerns during the plea colloquy because Otake gave him a "prefabricated card" from which to respond to the Court's questions. Dkt. No. 646 at 20; Dkt. No. 647 at 27; Dkt. No. 657-1 at 13.  Otake disputes this allegation, explaining:

> I provided [Kaʻanoi] with one short paragraph of suggested language to help [Kaʻanoi] answer when and if the Court asked him to, 'tell me in your own words why you believe you are guilty.' . . . I did not provide him a script instructing him how to answer any of the Court's other questions, including any questions about whether he had sufficient time to consider the plea agreement, whether he understood it, or whether he was satisfied with counsel.

Dkt. No. 656-1 at 6–7.  Moreover, as with the other aspects of this claim, the Court has already found this contention to lack any credibility.  *See* Dkt. No. 566 at 19 n.7 (explaining that in conducting the plea colloquy, the Court found Kaʻanoi to be lucid and appreciative of the proceedings).

### E.    __Ground 5: Probable Sentence__

Kaʻanoi next contends that Otake was ineffective by substantially misrepresenting the potential sentence that he would face upon pleading guilty pursuant to the plea agreement.  Dkt. No. 646 at 25.  According to Kaʻanoi, Otake explicitly advised him that "as the result of his cooperation" during the proffer sessions, "there was a great chance that he would receive a substantial departure from his sentencing . . . to [a] 7–10 year sentence."  Dkt. No. 647 at 25–26.  As such, Kaʻanoi claims that had he known that he could receive a substantially higher sentence, he would not have pled guilty and would have insisted on proceeding to trial.  Dkt. No. 646 at 60–61.

A defense attorney may be constitutionally ineffective where he provides the defendant with a "gross mischaracterization of the likely outcome."  *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986).  Here, however, as the Court has again already explained, there is simply no support for Kaʻanoi's claim that Otake promised him a seven to ten year sentence.  *See* Dkt. No. 566 at 22–25.  Notably, Otake disputes Kaʻanoi's claim, asserting that:

> In any discussion about sentencing, I made clear that this was an estimate only, and that the final guideline range could be higher or lower depending on the Court's ruling on certain factors in the sentencing guidelines.  I have never promised or guaranteed any specific sentence to any defendant I have ever represented in federal district court. . . . I surely did not ever represent that he would receive a low sentence in this case.

Dkt. No. 656-1 at 7.  In addition, Kaʻanoi's claims are also rebutted by the record. From the handwritten estimate that Otake allegedly provided to Kaʻanoi in December 2018, Otake calculated that Kaʻanoi's base level would be 36, with a potential two-level enhancement for being a leader or organizer, and a three-level downward adjustment for acceptance of responsibility.  *See* Dkt. No. 533-4 at 2. Accordingly, Otake's final estimate of Kaʻanoi's total offense level was 35 and his estimate of Kaʻanoi's criminal history category was III.  *Id.*  Although Otake's calculations underestimated the Court's final findings by one criminal history level and two offense levels,[8] his calculations still would have resulted in a guideline range of 210 to 262 months—nowhere close to the "seven to ten years" that Kaʻanoi alleges Otake suggested.  *See* U.S. Sent'g Guidelines Manual ch. 5 pt. A. To reach such a sentence would have required a departure of up to *ten levels* from Otake's calculations—something that the Court finds unlikely, particularly given Kaʻanoi's admitted reluctance to fully cooperate with the Government.  *See, e.g.*, Dkt. No. 646 at 17–19; Dkt. No. 647 at 24.  Accordingly, the Court does not find that Otake engaged in the type of "gross mischaracterization" required to show ineffective assistance in this regard.  *See Iaea*, 800 F.2d at 865 (explaining that "a

---

[8]The final PSR calculated Kaʻanoi's total offense level at 39 and his criminal history category at IV.  Dkt. No. 526 at 42.  At sentencing, the Government agreed to stipulate that the 4,532 grams of methamphetamine seized from Kaui's car was not attributable to Kaʻanoi, thereby decreasing his total offense level by two levels to 37.  *See* Dkt. No. 601 at 2–4, 16–17.  The Court thereafter adopted the PSR with this adjustment.  *Id.* at 16.

mere inaccurate prediction" does not constitute ineffective assistance of counsel);
*cf. United States v. Davis*, 428 F.3d 802, 805–06 (finding counsel grossly mischaracterized the defendant's potential sentence when such sentence would require a 20 to 30 level departure).

Moreover, even assuming that Otake indeed grossly mischaracterized the potential sentence, Ka'anoi cannot show that any prejudice resulted from the same. Otake explains that he explicitly told Ka'anoi that his calculations were "an estimate only, and that the final guideline range could be higher or lower depending on the Court's ruling on certain factors in the sentencing guidelines." Dkt. No. 656-1 at 7.  Otake further adds that he "repeatedly cautioned [Ka'anoi] that unless he was willing to cooperate against Kahale, it was unlikely that he would get the type of reduction he was hoping for."[9]  *Id.*  The Court also reiterated this at length during Ka'anoi's plea colloquy, explaining, *inter alia*, that:

> THE COURT:        *Despite any discussions you may have had with Mr. Otake*, with Mr. Inciong, or with anyone else

___

[9]Kahale refers to Wayne Lopaka Kahale—Ka'anoi's childhood friend who was excluded from the terms of the proffer agreement.  *See* Dkt. No. 515-2 at 1.  Notably, Ka'anoi appears to also contend that Otake was ineffective by encouraging him to "breach" the proffer agreement and provide information on Kahale, despite Otake having "secured the proffer agreement that excluded this Childhood friend from the beginning."  Dkt. No. 646 at 41; *see also* Dkt. No. 647 at 24–25, 29.  It is far from clear, however, how Otake's suggestion that *voluntarily* providing information on Kahale to the Government might lessen Ka'anoi's sentencing exposure amounts to constitutionally deficient assistance of counsel.  *See* Dkt. No. 656-1 at 7.  Nor has Ka'anoi shown that Otake's alleged actions were prejudicial in any way.  *See* Dkt. No, 515 (explaining that despite Ka'anoi's refusal to provide information on Kahale—as well as other individuals *not* exempted by the terms of his proffer agreement—the Government still sought a downward departure from his total offense level based on his cooperation).

> regarding the type or duration of the sentence you are likely to receive, or with respect to any sentencing recommendation that they may wish to provide to the Court, I'm not bound by those discussions nor am I bound by any recommendations that are provided to me, and I could impose a sentence more severe than what you expect up to the maximum permitted by law. Do you understand that?

KA'ANOI:        Yes.

THE COURT:      Has anyone made any promises to you, sir, with regard to what your [sentence] will be?

KA'ANOI:        No.

Dkt. No. 527 at 26–27 (emphasis added). These representations belie Ka'anoi's contentions that had he known that he could face a sentence greater than seven to ten years, he would not have entered a guilty plea. *See Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990) (finding no prejudice where the court explained during the plea colloquy that it had sole discretion as to the length of the eventual sentence). As Ka'anoi's claim therefore fails to meet either prong of *Strickland*, it is denied.

## F.    <u>Ground 6: Conflicting Interests</u>

Finally, Ka'anoi argues that Otake was ineffective because he had a conflict of interest during the course of his representation. To establish a constitutional claim of ineffective assistance of counsel based on an attorney's conflict of interest, "the defendant must show 1) that counsel actively represented conflicting

interests, and 2) that an actual conflict of interest adversely affected his lawyer's performance." *Mannhalt v. Reed*, 847 F.2d 576, 579–80 (9th Cir. 1988) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980)).  An "actual conflict of interest" exists where the conflict "*affected counsel's performance*—as opposed to a mere theoretical division of loyalties."  *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)); *see also Wood v. Georgia*, 450 U.S. 261, 271–72 (1981) (explaining that while a third party retaining an attorney on behalf of the defendant may pose a theoretical division of loyalties, the defendant must still show an actual conflict of interest).  Accordingly, "the defendant must show that counsel was influenced in his basic strategic decisions by loyalty to another client or former client" such that "some plausible alternative defense strategy or tactic might have been pursued but was not."  *Wells*, 394 F.3d at 733 (citations and quotation marks omitted).  Where the defendant successfully does so, prejudice is presumed.  *Mannhalt*, 847 F.2d at 580 (citing *Strickland*, 466 U.S. at 692).

Here, Kaʻanoi points to an incident occurring during his last proffer session in November 2019, in which the Government asked him to divulge information regarding two individuals—Michael Miske and Wayne Miller.  Dkt. No. 646 at 38; Dkt. No. 647 at 29; Dkt. No. 647-1 at 14.  Kaʻanoi asserts that he was reluctant to speak about those individuals because he believed either Miske or Miller to be a

client of Otake.  Dkt. No. 646 at 39; Dkt. No. 647 at 29; Dkt. No. 647-1 at 14.

Moreover, according to Kaʻanoi, Miller had actually retained Otake to represent

Kaʻanoi "on behalf of one Michael Mischke [sic] to know whether or not Petitioner

would cooperate, and if so, cooperate against him."  Dkt. No. 646 at 39.  Despite

this, however, Kaʻanoi claims that Otake "specifically stated that there was not a

conflict," and "urged Petitioner to go ahead and make for statements against such."

Dkt. No. 647 at 29; Dkt. No. 646 at 39.  Thereafter, Otake informed Kaʻanoi that

he was withdrawing due to the conflict of interest revealed at the last proffer

session, thereby "abandon[ing] this Petitioner via this bait-and-switch tactic."  Dkt.

No. 647 at 30; *see also* Dkt. No. 646 at 39–40; Dkt. No. 647-1 at 15.

This claim of ineffective assistance of counsel, however, is unavailing as

Kaʻanoi fails to show that any *actual* conflict of interest existed during the course

of Otake's representation.  To this end, Otake specifically attests that:

> I am not friends with Miller and have never represented him.  On the
> contrary, [Kaʻanoi] stated that Miller was his close friend, and expressed to
> me that he did not want to cooperate against Miller because of the
> friendship.  I neither encouraged nor discouraged [Kaʻanoi] to cooperate
> against Miller.  However, if he chose to do so it would not have presented a
> conflict for me.
>
> . . .
>
> Early on in my representation of [Kaʻanoi], I discussed the possibility of a
> conflict of interest with [Kaʻanoi] arising from my representation of Michael
> Miske.  I did not have specific reason to believe a conflict existed, but I
> wanted to explore it with [Kaʻanoi] to be sure.  I was assured by my

conversation with [Ka'anoi] early on in my representation that there was no conflict.

Dkt. No. 656-1 at 4–5, 7–8.  As such, any potential conflicts of interest arose only once Ka'anoi began cooperating with the Government.  *See id.* at 8.  At that point, after Ka'anoi raised concern over the potential conflicts, Otake encouraged him to provide any information he might have, including with regards to both Miske and Miller, and withdrew so that Ka'anoi could "pursue the route that gave him the best chance at the best downward departure."  *Id.*  Far from being inappropriate, such actions rather indicate that Otake acted in Ka'anoi's best interest, including by encouraging him to cooperate for his own benefit despite Ka'anoi's perception that doing so might cause a conflict for Otake.[10]  Accordingly, Ka'anoi's claim of ineffective assistance on this ground is denied.

## III.    Claim #2: Mark Kawata

Ka'anoi also asserts ineffective assistance provided by Mark Kawata—his attorney following Otake's withdrawal.  According to Ka'anoi, Kawata was ineffective with regard to communication, his motion to withdraw his guilty plea,

---

[10]Otake's statements are further supported by the record which indicates that it was *Ka'anoi*'s personal relationships—not Otake's—that may have rendered him "reticent to proffer information on persons in whom the Government was interested."  Dkt. No. 566 at 21 n.9; *see also* Dkt. No. 647-1 at 14 (Ka'anoi's declaration that Miller was the "benefactor who retained Otake on my behalf.").

sentencing, and a potential writ of certiorari to the Supreme Court.  The Court addresses each ground in turn.

### A.   __Ground 7: Communication__

In Ground 7, Ka'anoi asserts that Kawata was ineffective as he "did not make for any contact with Petitioner" and generally remained "coy and stayed at a distance."  Dkt. No. 647 at 32; *see also* Dkt. No. 647-1 at 16–18.  Ka'anoi explains that both he and his mother attempted to contact Kawata at various points, but "[a]lmost a year went by without contact or with sporadic contact with Kawata." Dkt. No. 647 at 33; *see also* Dkt. No. 647-1 at 16–17.  According to Ka'anoi, this continued until "another person in the FDC who knew Kawata personally had made contact on behalf of this Petitioner and urged Kawata by his religeous [sic] faith that it was his duty to endure justice, and that he had made public declaration that was his calling."  Dkt. No. 647 at 33–34; *see also* Dkt. No. 647-1 at 17.

The Court, however, finds that these assertions lack credibility.  For instance, Kawata explains that although he first made contact with Ka'anoi in January 2020, he did not actually receive the file from Otake until March of that year.  Dkt. No. 656-2 at 3.  Moreover, Kawata experienced difficulties contacting Ka'anoi due to the COVID-19 protocols put into effect during that same period. *Id.*  Nonetheless, he had "several calls with [Ka'anoi], his mother, and his significant other" and "multiple, at least eight in-person meetings with [Ka'anoi],

and more likely in excess of 12." *Id.* at 4.  Indeed, at some points, Kaʻanoi

acknowledges the same. *See* Dkt. No. 647-1 at 16–18 (explaining that although

communication with Kawata was difficult due to the COVID-19 lockdowns, he

had "several phone calls" with Kawata, and Kawata was in contact with Kaʻanoi's

mother).  Accordingly, Kaʻanoi fails to show that Kawata engaged in

constitutionally deficient levels of communication.

Further, Kaʻanoi has additionally failed to show how such alleged lack of

communication was prejudicial.  Despite his complaints, Kaʻanoi never explains

how the result of any proceeding—including the motion to withdraw the guilty

plea, the sentencing, or the filing of a petition for a writ of certiorari—would have

been different with better or more communication.  Rather, Kaʻanoi merely alleges

that he lacked communication regarding "information relevant to the process."

Dkt. 659 at 34.  Such broad and indefinite statements are not sufficient to show

prejudice.  Accordingly, this ground is denied.

### B.    Ground 8: Motion to Withdraw Guilty Plea

Next, Kaʻanoi asserts that Kawata provided ineffective assistance by failing

to include key arguments in his motion to withdraw his guilty plea.  Dkt. No. 646

at 43–44; Dkt. No. 647 at 4, 34–35.  Kaʻanoi claims that Kawata failed to inform

him of the motion's contents until after it had been filed.  Dkt. No. 647 at 4.  At

that point, Kaʻanoi realized that Kawata failed to raise numerous key arguments,

including: (1) Kaʻanoi's mistaken belief that he was still subject to the mandatory minimum life sentence and ignorance as to the First Step Act; (2) Otake's promise of a seven to ten year sentence; and (3) Otake's provision of a "pre-fabricated" card to read during the plea colloquy.  Dkt. No. 646 at 44–45.  Kaʻanoi further takes issue with Kawata's failure to raise his Attention Deficit Disorder ("ADD") until the Reply Brief.  Dkt. No. 647 at 35.  According to Kaʻanoi, the motion's failure to include such "essetnial [sic] elements" meant that it was "not well-taken and rejected by the Court"—the implication being that the Court likely would have granted the motion otherwise.  Dkt. No. 646 at 60.

Each of Kaʻanoi's allegations, however, is contradicted by Kawata's declaration and the record generally.  As an initial matter, Kawata asserts that he discussed the facts and arguments for the motion at length with Kaʻanoi, his mother, and his significant other.  Dkt. No. 656-2 at 3–4.  Kawata also mentions that he reviewed the declarations with Kaʻanoi and made any requested changes.  *Id.* at 13.  Accordingly, Kaʻanoi was fully aware of the contents of both the declaration and the motion at large prior to it being filed.  *Id.* at 3–4, 13.

Next, Kaʻanoi fails to establish that Kawata was deficient with respect to his failure to include Kaʻanoi's desired arguments in the motion to withdraw the guilty plea.  With respect to Kaʻanoi's first argument, Kawata denies that Kaʻanoi ever

suggested that he had been "coerced" by a mandatory minimum life sentence,

explaining:

> [Kaʻanoi] did not raise with [me] the notion that he had not been informed about a change in the law with the enactment of the First Step Act.  To [my] understanding, at the time [Kaʻanoi] signed the Plea Agreement in this case, [Kaʻanoi] did not believe that he was subject to a mandatory minimum life sentence.  [Kaʻanoi] did not raise the matter of a mandatory minimum life sentence with [me] or any change in the law.  . . . In any case, [Kaʻanoi] did not ask [me] to include such an argument as part of his Motion.  Had [Kaʻanoi] raised that further, [I] would have investigated it further and might have included it in the Motion.

Dkt. No. 656-2 at 5–7.  Moreover, with respect to Kaʻanoi's second and third

arguments, Kawata actually *included* Kaʻanoi's claims regarding Otake's estimated

seven to ten year sentence and script at the plea hearing.  *See* Dkt. No. 533-1 at 11,

16–17, 28, 30.  As such, there is simply no factual basis for Kaʻanoi's claims that

Kawata failed to properly include such arguments in the motion.

Kaʻanoi also fails to establish that Kawata was ineffective by attempting to

"shoehorn" new facts in the Reply Brief, including that Kaʻanoi suffered from

ADD.[11]  Dkt. No. 647 at 34–35.  Notably, there is no indication that Kawata could

have raised Kaʻanoi's ADD in the opening brief as he claims that Kaʻanoi and his

family failed to disclose such condition until after the motion had been filed.  Dkt.

---

[11]At one point, Kaʻanoi appears to assert that Kawata may have been ineffective by failing to include his argument that newly received CDs and transcripts revealed that Kaʻanoi did not have any "illegitimate dealings . . . in 2016 regarding any drug trafficking."  Dkt. No. 647 at 34–35.  As Kaʻanoi appears to retract this argument, however, the Court will not further address it as part of this claim.  *See id.* ("Petitioner and Kawata had only recently received these partial CD's [sic] and transcripts, thus, here proper.").

No. 656-2 at 8–12.  As such, the Court does not find that including such information in the Reply Brief constituted constitutionally deficient conduct.  *See* Dkt. No. 566 at 21 n.8 (considering and rejecting Kaʻanoi's claim that his ADD prevented him from properly understanding the plea agreement).

Finally, even if Kawata failed to communicate properly or include all of Kaʻanoi's desired arguments in the opening brief, Kaʻanoi has not established that better communication or inclusion of the omitted arguments would have resulted in a different outcome.  As the Court has already explained at length, each of Kaʻanoi's arguments lacks credibility and is contradicted by the record generally.  *See supra* 12–16, 22 n.7, 23–27; see *also* Dkt. No. 566 (denying Kaʻanoi's motion to withdraw his guilty plea).  Accordingly, this claim fails to meet either of *Strickland*'s two prongs and is, therefore, denied.

### C.    Ground 9: Drug Quantity Stipulation

Next, Kaʻanoi claims that Kawata rendered ineffective assistance of counsel by incorrectly advising him to accept the Government's offer to stipulate that he would not be held responsible for the 4,532 grams of methamphetamine seized from co-defendant Kaui's vehicle.  Dkt. No. 646 at 46; Dkt. No. 647 at 36–38; Dkt. No. 647-1 at 19–20.  Specifically, in the lead-up to the sentencing hearing, Kaʻanoi apparently received new *Brady-Giglio* information regarding Kaʻanoi's responsibility for the drugs in question.  Dkt. No. 646 at 46; Dkt. No. 647 at 37;

Dkt. No. 647-1 at 19.  Accordingly, he contends that Kawata should not have accepted the stipulation, but rather proceeded with the motion to continue sentencing as this new disclosure could have been used to further dispute the factual basis of the plea agreement.  Dkt. No. 646 at 46; Dkt. No. 647-1 at 20; Dkt. No. 659 at 36–37.

Such arguments defy logical sense.  For instance, as the Court noted, the Government's stipulation essentially mooted out the motion to continue sentencing as that motion concerned the same quantity of methamphetamine for which Kaʻanoi was no longer being held responsible.  Dkt. No. 601 at 3–4.  As such, there would be no legitimate grounds to proceed with the motion to continue when the underlying basis had already been resolved.

Moreover, even if Kawata had pursued the motion to continue and the Court had granted it, it is unclear how Kaʻanoi expected that continuing to contest this disputed quantity of drugs—despite the Government's offer to stipulate—would enhance his position with respect to the integrity of his plea agreement, particularly when the Court had already denied his prior motion attacking the same.  *See* Dkt. No. 566 (finding Kaʻanoi's plea to be knowing, intelligent, and voluntary, including with regard to the amount of drugs for which he could potentially be held responsible); *see also* Dkt. No. 656-2 at 19 (explaining that by the time of sentencing, Kawata had ensured that "[Kaʻanoi] understood that this Court would

not be amenable to any suggestion that [Kaʻanoi] was not responsible for the conduct outlined in the Plea Agreement.").   Accordingly, the Court does not find that Kawata provided ineffective assistance in this regard.

### D.   Ground 10: Leadership Enhancement

In Ground 10, Kaʻanoi additionally contends that Kawata should have argued more vigorously against the application of the four-level leader/organizer enhancement that he received at sentencing.  Dkt. No. 646 at 47–56; Dkt. No. 647 at 38–39.  Under USSG § 3B1.1(a), a defendant may be subject to a four-level enhancement at sentencing "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sent'g Guidelines Manual §3B1.1(a).  In Kaʻanoi's case, the PSR recommended that this enhancement be applied, as the record established that Kaʻanoi organized the charged drug distribution conspiracy and controlled the flow and sale of methamphetamine through his sub-distributors across Oʻahu.  Dkt. No. 526 at 18.  Kawata objected to this enhancement, both in the sentencing statement and at the sentencing hearing, based primarily on Kaʻanoi's assertions that "[w]hile early on he did provide drugs, he withdrew from the conspiracy at the end of December, 2015, and did not direct others, nor interact with them."  Dkt. No. 523 at 5; Dkt. No. 601 at 10–12.  At sentencing, the Court overruled Kawata's

objections, finding the enhancement to be well-supported by the facts in the record. Dkt. No. 601 at 13–15.

Ka'anoi now asserts that although Kawata raised the objection at sentencing, he provided ineffective assistance by failing to "expound upon this argument. Instead, [he] made a lackluster presentment of 1/2 of a page on the Transcript and did not address any of the facts in concern to the legalities in concern to the provision at USSG § 3B1.1(a)." Dkt. No. 646 at 48; *see also* Dkt. No. 647 at 38 (Kawata "did not expound in any meaningful manner in concern to this enhancement other than a basic objection."). In particular, Ka'anoi claims that he never "agree[d] to a 4 level enhancement under USSG § 3B1.1(a) for being in anyway considered to be a 'leader or organizer' in the offense." Dkt. No. 646 at 47. As such, he faults Kawata for failing to make any "arguments in support of his objections" or to cite to several cases which "clearly show that Petitioner was not in fact a leader or organizer of any organization, and for the government to advocate for such application outside of the plea agreement and it's [sic] terms this was bad faith." *See id.* at 52–56.

Ka'anoi fails, however, to show that Kawata's efforts fell below a reasonable standard of conduct. As an initial matter, neither Ka'anoi nor Kawata was ever required to agree to the application of the enhancement, nor, in any case, would any such agreement, or lack thereof, be binding upon this Court. *See* Dkt.

No. 344 at 13 (explaining in Kaʻanoi's plea agreement that the Court is not bound by any stipulation between the parties).

Further, Kawata explains that his choice not to vigorously pursue this objection was a strategic one.  Dkt. No. 656-2 at 15–17.  Kawata states:

> In [my] professional judgment, it would not have been wise or appropriate to push harder on this issue that [I] did.  The only evidence that [Kaʻanoi] was not a leader or organizer was his own statements. . . . [I] warned [Kaʻanoi] it was important to maintain credibility with the Court, and that offering arguments that appeared to be disingenuous would be viewed in a bad light. [I] warned [Kaʻanoi] that to push the issue harder—and strenuously argue that [Kaʻanoi] was not an organizer/leader—would result in losing credibility with the Court and risking a less favorable outcome.

*Id.* at 16.  This decision, particularly given the significant evidence in the record supporting Kaʻanoi's leadership role, *see* Dkt. 601 at 13–15, was eminently reasonable, and Kaʻanoi does not provide a credible basis to suggest otherwise.

Finally, although Kaʻanoi mentions case law which he believes Kawata should have raised, none of these cases are binding authority, nor do they support Kaʻanoi's position.[12]  Indeed, at least with respect to the non-binding nature of

---

[12]The two main cases Kaʻanoi cites are *United States v. Mayes*, 370 F.3d 703 (7th Cir. 2004) and *United States v. Martinez Vega*, 826 F.3d 514 (D.C. Cir. 2016).  In *Mayes*, the court found that the leadership/organizer enhancement did not apply where the record lacked sufficient information to find anything "remotely resembling a hierarchy."  370 F.3d at 711.  In contrast, in *Martinez Vega*, the court found that the defendant had managed or supervised others where there was testimony suggesting he "may have a troop" and was "like our commander, our immediate commander."  826 F.3d at 539.  Kaʻanoi argues that like the defendant in *Mayes* and unlike the defendant in *Martinez Vega*, he was nowhere close to engaging in the kind of "structured heirarchial [sic] positioning" required under the USSG.  Dkt. No. 656 at 51–54.  The USSG, however, do not require anything close to the kind of rigid, militaristic structure Kaʻanoi envisions.  *See* U.S. Sent'g Guidelines Manual §3B1.1(a) cmt. 4.  Moreover, as the Court

such cases, Ka'anoi acknowledges the same. *See id.* at 52 ("Petitioner has presented several *out-of-circuit* cases to make this demonstration" (emphasis added)). Accordingly, Kawata's failure to raise such cases cannot have rendered him ineffective. Ka'anoi's own dissatisfaction with Kawata's strategic choices—or with the Court's ultimate decision to overrule the objection—does not provide a basis to find that Kawata's actions fell below a reasonable range of conduct.

Moreover, Ka'anoi cannot show prejudice, as Kawata's tactic was likely the correct approach. Despite Ka'anoi's argument that the Court had "no basis what-so-ever" to apply the enhancement, Dkt. No. 647 at 38, the Court explained at length during sentencing that Ka'anoi was receiving the enhancement because:

> The defendant was quite clearly the local source of supply of both methamphetamine and cocaine during the referenced conspiracy period. He and no one else brought the drugs into Hawaii from his contacts in Las Vegas, and there's no evidence, as I said, that anyone else was his equal.
>
> He sold directly to Mr. Puha, as well as Mr. Kaui. Those individuals then subdistributed to others, both in and outside of the conspiracy, to include Mr. Lono and Mr. Martin, and it is irrelevant to the adjustment for the role in offense that the defendant did not know those at the bottom of the pyramid. Doesn't make any difference at all.
>
> Similarly, the fact that he claims that he withdrew from the conspiracy the end of 2015 . . . and that he was thereafter not involved, makes no difference whatsoever. You can't put drugs into the stream of commerce and then declare that I'm out, and therefore then have no responsibility for the drugs

___

extensively detailed at sentencing, here there is overwhelming evidence establishing that Ka'anoi was the lead supplier and directed the sales activities of his subordinates. *See* Dkt. No. 601 at 13–15. Ka'anoi's suggestion that Kawata should have relied on these cases is therefore misplaced.

thereafter.  Those drugs continue to permeate our community, as it did in this case in April, in June, and again in July of 2016.  And the fact that you self-declare that you're no longer part of this doesn't work.  If that were true, that would be news across the country to every drug seller, regardless of the controlled substance that he or she distributed.

. . .

In addition, we know that it wasn't the case because the defendant continued to take acts beyond the end of 2015 to include laundering drug...monies...through his own business.  That quite clearly occurred and we know it because he admitted it occurred well into the 2016 time period. So he definitely was not out of the business and out of action, so to speak, come December 31st, 2015.  That was not the witching hour here at all, as a matter of fact or as a matter of law.

The defendant dictated the quantities and prices that his customers, Mr. Kaui and Mr. Puha, would receive, what they would be paid for their efforts, and whether product would be extended and to whom on a consignment basis. As I said, he also laundered the drug trafficking proceeds and invested those proceeds back into the business paying for things like storage costs for drugs and money, and transportation and hotel costs necessitated by the fact that his supply line extended all the way to Las Vegas.  Collectively this is far more that what's enough to establish the basis for the four-level 3B1.1 adjustment.

Dkt. No. 601 at 13–15.  Accordingly, even if Kawata had continued to press the

issue—including by raising irrelevant and out-of-circuit cases—based on the

factual record, Kaʻanoi would have still received the four-level

leadership/organizer enhancement under USSG § 3B1.1(a).  Further, as Kawata

also acknowledges, Kaʻanoi very well may have jeopardized the acceptance of

responsibility adjustment he received due to his entirely illogical insistence that by

purportedly exiting the conspiracy in 2015, he no longer bore any responsibility

thereafter for the drugs which he put into the stream of commerce. *See* Dkt. No. 656-2 at 17 ("In [my] mind, making a flat-out argument to Judge Watson that [Ka'anoi] was no longer involved in the conspiracy and had not held a significant leadership role would not be well received, and would be viewed as failing to accept responsibility."). As such, Ka'anoi cannot establish prejudice under *Strickland*'s second prong as he fails to show that a different or more strenuous argument would have altered the outcome.

In sum, the Court finds that Kawata did not provide ineffective assistance with respect to Ground 10.[13]

### E.  Ground 11: Petition for Writ of Certiorari

Finally, in Ground 11, Ka'anoi argues that Kawata was ineffective by informing him that he would file a petition for a writ of certiorari to the Supreme Court on his behalf, and then missing the deadline to do so. Dkt. No. 647 at 41; Dkt. No. 647-1 at 22–23. Specifically, Ka'anoi claims that he informed Kawata that, following the dismissal of his Ninth Circuit appeal on June 22, 2022, he wished for Kawata to withdraw, and he wished to file a petition for writ of certiorari in the Supreme Court. *Id.* Kawata apparently refused to withdraw,

---

[13]Ka'anoi appears to also claim that Otake was ineffective by failing to advise him that this sentencing enhancement—which did not appear in the plea agreement—might apply. *See* Dkt. No. 646 at 48. However, as the Court has already explained, any such arguments with regards to Ka'anoi's potential sentence fail in light of the Court's extended colloquy with Ka'anoi on precisely that matter. *See supra* 25–27; *see also* Dkt. No. 527 at 25–28.

instead assuring Kaʻanoi he would file such a petition by the 120-day deadline.  *Id.*
The Supreme Court, however, requires petitions for writs of certiorari to be filed
within 90 days.  *Id.*; *see also* Sup. Ct. R. 13.  It was not until December 13, 2022—
almost six months later—that Kaʻanoi discovered that Kawata had failed to ever
file such a petition.  Dkt. No. 647 at 41; Dkt. No. 647-1 at 23.

       This claim, however, is unavailing as a matter of law.[14]  The Sixth
Amendment does not provide criminal defendants with the right to counsel—let
alone effective counsel—in pursuing a discretionary petition for a writ of certiorari
to the Supreme Court.  *Ross v. Moffitt*, 417 U.S. 600, 616–18 (1974); *see also*
*Miller v. Keeney*, 882 F.2d 1428, 1432 (9th Cir. 1989) ("Because Miller had no
constitutional right to counsel in connection with the filing of a certiorari petition,
he had no constitutional right to the effective assistance of counsel for that
purpose.").  Thus, Kaʻanoi's claim that Kawata rendered him ineffective assistance
of counsel by failing to timely file a certiorari petition fails as no such right exists.
*Miller*, 882 F.2d at 1433.

**IV.   <u>Evidentiary Hearing</u>**

       In one of his Section 2255 motions, as well as in his memorandum in
support, Kaʻanoi requests an evidentiary hearing on his assorted claims for relief.

---

[14]As there is no legal basis for this claim of ineffective assistance of counsel, the Court declines
to evaluate whether Kawata's alleged failures violated the *Strickland* test.

*See* Dkt. No. 647 at 1; Dkt. No. 646 at 62–64.  Pursuant to 28 U.S.C. § 2255(b), the

Court must grant such hearing requests "unless the motion and the files and records

of the case conclusively show that the prisoner is entitled to no relief."

     Here, as detailed above, the record conclusively demonstrates that Ka'anoi is

not entitled to relief based on the claims of ineffective assistance of counsel raised

in his Section 2255 motions.  Accordingly, the Court finds that no evidentiary

hearing is warranted.

## V.    <u>Certificate of Appealability</u>

     Finally, in denying Ka'anoi's Section 2255 motions, the Court must address

whether he is entitled to a Certificate of Appealability ("COA").  Pursuant to 28

U.S.C. § 2253(c)(2), the Court may issue a COA in a Section 2255 proceeding

only where "the applicant has made a substantial showing of the denial of a

constitutional right."  Such a "substantial showing" occurs when "reasonable

jurists could debate whether (or, for that matter agree, that) the petition should

have been resolved in a different manner or that the issues presented were adequate

to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473,

484 (2000) (citations and quotation marks omitted).

     Here, in light of the findings above, the Court finds that reasonable jurists

would not debate the resolution of the Section 2255 motions.  The Court therefore

declines to issue Ka'anoi a COA.

## **CONCLUSION**

For the reasons set forth herein, Petitioner Kaʻanoi's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Dkt. No. 645, and Motion for Collateral Relief and Request for Evidentiary Hearing Pursuant to 28 U.S.C. § 2255, Dkt. No. 647, are DENIED.  In addition, the Court DENIES a Certificate of Appealability.

The Clerk of Court is instructed to enter Judgment in favor of Respondent, United States of America, and then to CLOSE Case No. 23-cv-00297-DKM-KJM.

IT IS SO ORDERED.

DATED: January 30, 2024 at Honolulu, Hawaiʻi.

Derrick K. Watson
Chief United States District Judge

_United States of America vs. Justin Kaʻanoi_; Cr 17-00555 DKW and Civ No. 23-00297 DKW-KJM; **ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY; (2) DENYING MOTION FOR COLLATERAL RELIEF AND REQUEST FOR EVIDENTIARY HEARING PURSUANT TO 28 U.S.C. § 2255; AND (3) DENYING CERTIFICATE OF APPEALABILITY**